J-S07002-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.Y. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.M.Y. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1063 WDA 2020 |

Appeal from the Order Entered September 9, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000117-2019

BEFORE:  SHOGAN, J., DUBOW, J., and KING, J.

MEMORANDUM BY SHOGAN, J.:                 **FILED:  April 26, 2021**

L.M.Y. ("Mother") appeals from the order entered on September 9, 2020, in the Court of Common Pleas of Allegheny County, involuntarily terminating her parental rights to her daughter, A.Y. ("Child"), born in June of 2013.[1]  Upon careful review, we affirm.

The certified record reveals that Allegheny County Office of Children, Youth and Families ("CYF") became involved with this family in 2017, after Father admitted to the rape of his stepdaughter when she was between the

_____

[1] By the same order, the orphans' court involuntarily terminated the parental rights of Child's natural father, P.Y. ("Father").  Father did not file a notice of appeal, and he is not a participant in this appeal.

ages of fourteen and twenty.[2]  N.T., 9/4/20, at 5.  Father's stepdaughter was Mother's older daughter and Child's half-sister.  *Id.*  Mother was aware of Father's admission, but she did not believe that Father was guilty of the offenses.  *Id.*

On September 7, 2017, Child was placed in the custody of CYF due to Father[3] remaining in the home with Mother and CYF being unable to ensure Child's safety.[4]  N.T., 9/4/20, at 5.  The Honorable Duane D. Woodruff adjudicated Child dependent on November 29, 2017.  *Id.*

In furtherance of Child's permanency goal of reunification, Mother was required to successfully complete "coached visitation" through Holy Family Institute, which involved working with Mother on her parenting skills.  N.T., 9/4/20, at 7.  In addition, Mother was required to successfully complete non-

---

[2] Father pleaded guilty to the following felonies related to the rape of his stepdaughter:  18 Pa.C.S. §§ 3121(a)(1), 3123(a)(1), 6318(a)(1), and 2718(a)(2).  N.T., 9/4/20, at 6–7; Petition for the Involuntary Termination of Parental Rights, 7/8/19, at Exhibit F-2.

[3] On February 7, 2018, Father was sentenced to a term of incarceration for three to six years and five years of probation.  N.T., 9/4/20, at 175; Involuntary Termination Petition, 7/8/19, at Exhibit F-2.  Father is registered as a Tier III Megan's Law offender, which prohibits him from being in the presence of children under the age of eighteen.  N.T., 9/4/20, at 7.

[4] CYF caseworker, Stephanie Schmidt, testified that Child was four years old and "extremely developmentally delayed" at the time of her placement.  N.T., 9/4/20, at 3, 19.  Ms. Schmidt testified that Child's developmental delays were not caused by a medical problem, and her delays have been addressed by her foster parents.  *Id.* at 20.

offenders therapy, related to Father's rape of her older daughter, through the Center for Victims of Violent Crimes; complete in-home services, which "assisted her with housing and connected her with individual therapy and non-offenders therapy"; obtain and maintain suitable housing; and undergo a mental health evaluation. *Id.* at 8–10.

On July 8, 2019, CYF filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). Judge Woodruff also presided over the related evidentiary hearing on September 4, 2020, *via* Microsoft Teams, an internet technology application.[5]

CYF presented the testimony of caseworker, Stephanie Schmidt,[6] and the court-appointed licensed psychologist, Dr. Beth Bliss. Mother testified on her own behalf, and she presented the testimony of her Holy Family Institute visitation coaches, Emily MacKowiak and Jeanine Lemarie. Child's therapist, Stephanie Davis, and Mother's therapist, Sheri Robinson, a licensed professional counselor from Family Resources, also testified.

In its opinion pursuant to Pa.R.A.P. 1925(a), the orphans' court set forth its findings of fact. Our review of the record reveals that the findings are supported by the testimonial evidence. Therefore, we adopt the orphans' court's factual findings. Orphans' Court Opinion, 12/7/20, at 6–12.

---

[5] Child's legal interests were represented by Gary D. Ludin, Esquire.

[6] The orphans' court erroneously labeled Ms. Schmidt as the visitation coach for the family. Orphans' Court Opinion, 12/7/20, at 6; N.T., 9/4/20, at 3–4.

The orphans' court determined that CYF's witnesses were credible. Specifically, CYF caseworker, Ms. Schmidt, testified that the Center for Victims of Violent Crimes discharged Mother on two separate occasions for unsuccessful completion of her required non-offenders therapy. N.T., 9/4/20, at 8–9. Mother had completed five sessions of non-offenders therapy by January 22, 2018, and she was discharged in March of 2018. *Id.* at 9. Mother restarted the therapy on August 18, 2018, but she was again discharged for non-completion in February of 2019. *Id.* Caseworker Schmidt testified on direct examination, "On January 22nd, of 2018, [Mother] had completed five sessions at which time that was to determine which services would best meet her needs. Due to [Mother's] avoidance regarding the veracity of her [older] daughter's disclosure, she would not have benefitted from their program at that time." N.T., 9/4/20, at 8. Ms. Schmidt further testified:

> Q. [C]ould you please tell us without stating anything that you learned from The Center for Victims, could you just please state whether [Mother] was discharged without successful completion?
>
> A. Yes, she was discharged without successful completion.
>
> Q. You said that happened twice?
>
> A. Twice.

N.T., 9/4/20, at 8–9. By the time of the subject proceeding, Mother had not re-enrolled in non-offenders therapy.

It is undisputed that at least until February of 2019, Mother remained in contact with Father, but she denied such contact to CYF and Dr. Bliss. N.T., 9/4/20, at 87. Further, Ms. Schmidt testified that Mother:

> stated to myself that she did not believe [her older daughter]. She had stated that [Father] was innocent until proven guilty. She stated that her [older] daughter was jealous of her. And [she] just continued to really go on for months even at this point that she just did not believe her [older] daughter.

*Id.* at 23.

Ms. Schmidt testified that Mother was referred for "coached visitation"[7] in October of 2017, and it was ongoing at the time of the hearing. N.T., 9/4/20, at 7. Ms. Schmidt testified that Mother made minimal progress in her parenting skills. *Id.* at 12.

Mother's supervised visitation was reduced during Child's dependency. Ms. Schmidt testified that Mother was granted supervised visits with Child three times per week for a total of ten hours every week from October of 2017 through April 10, 2019. N.T., 9/4/20, at 13. Following a permanency review hearing on April 10, 2019, Mother's visits were reduced to twice per week for a total of six hours. *Id.* Mother's visits were again reduced after the permanency hearing on October 7, 2019, to once per week for a total of three

---

[7] Coached visitation is not specifically defined in the record, but the testimony of the two "coaches," Ms. MacKowiak and Ms. Lemarie from Holy Family Institute, reveals that they observed visitation and guided Mother by giving her tips on how to handle issues as they came up during visits. N.T., 9/4/20, at 113, 135–136.

hours. *Id.* On January 27, 2020, Mother's visitation schedule remained the same, but the court scheduled them at Child's discretion. *Id.* at 13. Ms. Schmidt explained that Child "oftentimes . . . would state she did not want to go to visits[.] [S]he would want to leave early." *Id.* at 13–14. In addition, she stated that Child demonstrated behavioral issues before visits. *Id.* at 14.

Ms. Schmidt did not recommend reunification of Child with Mother for the following reasons:

> [CYF's] greatest concern is [Mother] has not been able to identify a family plan on how she can keep [Child] safe. Another concern is [Mother] has not been able to show consistency where [Child's] medical needs are [sic]. [Child] at the time when she came into care . . . had not been seen by a medical professional since she had been two years old.
>
> There's also concerns [Mother] seems to struggle with being able to engage with [Child] on an age[-appropriate] level. There are concerns that [Mother] is unable to ensure that the needs and welfare of [Child] are maintained.

N.T., 9/4/20, at 20.

Dr. Bliss recommended that Child be adopted.[8] N.T., 9/4/20, at 80. Dr. Bliss found Mother "less than honest and forthcoming in her interviews and answers to testing." *Id.* at 71. In addition, Dr. Bliss testified that during her evaluation of Mother in 2018, Mother told her she "was having no contact

---

[8] Dr. Bliss completed four separate evaluations of Mother beginning in September of 2017 and concluding in July of 2020. N.T., 9/4/20, at 57, 60–61. Dr. Bliss prepared reports in December of 2017, February and August of 2018, March and September of 2019, and July of 2020, all of which were submitted as evidence; none of the reports are included in the certified record before this Court. *Id.* at 108–109.

whatsoever with [Father] anymore." *Id.* at 87. Dr. Bliss explained that CYF did not believe Mother, so CYF obtained jail records which "showed she was having pretty much . . . daily contact with" Father. *Id.* Dr. Bliss confronted Mother at her next evaluation, and "she admitted that she had been having that contact with him." *Id.* at 88.

Dr. Bliss diagnosed Mother with unspecified personality disorder with narcissistic traits, which she described as a "pattern of chronic pervasive traits across settings, across times that cause problems in at least . . . relationships with others, emotional regulation or thought patterns." N.T., 9/4/20, at 67–68. She explained that Mother's diagnosis affects her parenting as follows:

> One is her apparent lack of empathy. It seems to impact how she's approached these allegations and eventual conviction of her husband. She can't seem to put herself in essentially her older daughter's shoes with regard to how it impacts her children if she would continue to have this relationship [with Father]. Or even with [Child], how it would impact [Child] that she is doing things to make it so [Child] can't be returned to her care. . . .
>
> Also she tends to lack complete accountability. She never really takes full accountability for her actions at all. She is frequently blaming others and that continues. I saw that very strongly from the very beginning and it has continued up until the most recent evaluation. So, for instance, . . . she said she's never attended any medical appointments of [Child]'s because she was never told of any appointments. But this has been [an] ongoing claim she had throughout all the years.
>
> She claims she is not in non-offenders treatment because she can't get ahold of them. She claims that she has tried to say [sic] the safety plan. . . . Initially it was that no one told what she needed for a safety plan, so she could come up with one[,] and then she had one and [she stated] it falls on deaf ears.

> So it is a constant blaming [of] everyone.  Although . . . any one of those things alone could be true in a case, . . . it is unlikely every single problem in her case and her life is due to other people and never due to herself.

*Id.* at 70–71.

By order dated September 4, 2020, and entered on September 9, 2020, the orphans' court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).  On October 8, 2020, Mother filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  On December 7, 2020, the orphans' court issued an opinion pursuant to Rule 1925(a).

On appeal, Mother presents the following issues for our review:

> 1.     Did the [orphans'] court abuse its discretion and/or err[] as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

> 2.     Did the [orphans'] court abuse its discretion and/or err[] as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 6.

We review this appeal according to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights.  As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010).  If the factual findings are supported, appellate courts review to determine if the trial court made an

error of law or abused its discretion. **Id.**; **R.I.S.**, [614 Pa. 275, 284, 36 A.3d 567, 572 (Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. **Id.**; **see also Samuel Bassett v. Kia Motors America, Inc.**, 613 Pa. 371, 34 A.3d 1, 51 (Pa. 2011); **Christianson v. Ely**, 575 Pa. 647, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. **Id.**

As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, 539 Pa. 161, 650 A.2d 1064, 1066 (Pa. 1994).

**In re Adoption of S.P.**, 47 A.3d 817, 826–827 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests

of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

We review the order pursuant to Section 2511(a)(8) and (b),[9] which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the

---

[9] We must agree with the orphans' court as to only one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

To terminate parental rights pursuant to 23 Pa.C.S. § 2511(a)(8), the following factors must be demonstrated: "(1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275–1276 (Pa. Super. 2003); 23 Pa.C.S. § 2511(a)(8).

"Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the child[]'s removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the twelve-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of CYS supplied over a realistic time period. *Id.* The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). This Court has recognized:

[T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems

- 11 -

that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*Id.* at 11–12 (citations omitted).

With respect to the "needs and welfare" analysis pertinent to Sections 2511(a)(8) and (b), we have observed:

[I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*) (citations omitted).

With respect to 23 Pa.C.S. § 2511(b), this Court has stated: "Intangibles such as love, comfort, security, and stability are involved in the inquiry into

the needs and welfare of the child." ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." ***Id.*** (citation omitted).

On appeal, Mother asserts the orphans' court abused its discretion in relying on the testimony of CYF caseworker, Ms. Schmidt, and court-appointed psychologist, Dr. Bliss. Mother's Brief at 26–28. Thus, Mother suggests that the orphans' court abused its discretion in its credibility determinations. ***Id.*** We disagree.

We note that the orphans' court considered Mother's testimony, along with that of the visitation coaches, Ms. Lemarie and Ms. MacKowiak; Mother's therapist, Sheri Robinson; and Child's counselor, Stephanie Davis. Orphans' Court Opinion, 12/7/20, at 10–12. The orphans' court credited Mother's testimony that she had been in weekly therapy since January 12, 2018, and noted that Mother "provided scenarios on how she would respond if [F]ather was to come to her home, if [Child] was present." Orphans' Court Opinion, 12/7/20, at 11–12 (citing N.T., 9/4/20, at 146–147). Mother testified, "I have the police on call, I will not open up that door, and I will reach out however I can to make sure that [Father] is never allowed in my presence at all. I don't want nothing [sic] to do with him, that's why I filed for the divorce." N.T., 9/4/20, at 156.

The orphans' court also credited the testimony of the visitation coaches regarding Mother's goals of safety issues in the home and working with her to bond with Child. N.T., 9/4/20, at 113, 135–136. The orphans' court underscored that Ms. MacKowiak began working with the family approximately three months before the subject proceeding. Orphans' Court Opinion, 12/7/20, at 10; N.T., 9/4/20, at 112. Ms. MacKowiak testified that she has "no safety concerns or supervision concerns or anything at the visits I've seen." N.T., 9/4/20, at 116. Ms. MacKowiak testified on direct examination:

> Q. In your opinion, is [coached visitation] still needed to continue at this point?
>
> A. Yes.
>
> Q. Is it being productive in any way?
>
> A. Yes, I think it is.

*Id.* at 116–117.

Similarly, Ms. Lemarie, Mother's visitation coach from December of 2019 until July of 2020, testified, "With my experience with [Mother,] she did make progress." N.T., 9/4/20, at 137. She explained:

> I think [Mother] is absolutely able to keep [Child] safe in the house. I never saw anything that any interaction or anything that could've possibly been a safety hazard for [Child] that [Mother] did not address with her. And I also believe that increased bonding has also been met, that is not to say she is perfect, that is not to say all interactions are perfect, but I believe there's signs of progress toward those goals.

*Id.* at 139–140.

With respect to Mother's therapist, Sheri Robinson, the orphans' court found as follows:

> Ms. Robinson testified that [Mother] has been able to stabilize her emotions, accept her past[.] [S]he has increased frustration tolerance, and has learned a lot of developmental education pertaining to [Child] and her oldest daughter. [N.T., 9/4/20,] at 192–193. Ms. Robinson testified:
>
>> In [Mother's] case regarding her treatment, it has been steady, it has been consistent due to her consistent weekly participation. You know, she has grown with being able to let go of the guilt and denial. And she has been able to be honest with herself and with others which is a tremendous change from, you know, a year ago, a year and a half ago[,] which definitely affects her behavior, the way she thinks, the way she perceives things [,] and the way she parents. *Id.* at 194.

Orphans' Court Opinion, 12/7/20, at 12.

Finally, the orphans' court considered the testimony of Stephanie Davis, Child's therapist, who first met Child in October of 2018. N.T., 9/4/20, at 121. The court referenced Ms. Davis's testimony that Child "shared with Ms. Davis that '[Child's] been crying a lot because she has not been able to see her mother and [older] sister . . . as often as she would like.'" Orphans' Court Opinion, 12/7/20, at 10 (citing N.T., 9/4/20, at 126). Further, the orphans' court noted:

> Ms. Davis also expressed that [Child] became "anxious related to changing environments," when they were discussing what could possibly happen as a result of [the termination] hearing. Ms. Davis and [Child] discussed the possibility of moving back with Mother versus remaining with her foster family. Ms. Davis also testified, in regards to the anxiety, "It was based on friendship (with peers). It wasn't based directly on caretakers. It

seemed to be based more on where she was living . . . than a personal preference." [N.T., 9/4/20,] at 131.

Orphans' Court Opinion, 12/7/20, at 10–11.

After considering all of the evidence, the orphans' court set forth its

conclusions as follows:

> CYF has met its burden of proof by clear and convincing evidence that grounds for termination of parental rights exist as to Mother, who had made minimal progress throughout the life of this case. She has not demonstrated her ability to provide care, control, nor the ability to protect [Child]. This [c]ourt acknowledges Mother's love and desire to maintain a relationship with [Child]. This [c]ourt also applauds Mother['s] continuous involvement with therapy since 2018. However, Mother's progress throughout the case has been minimal[,] and she has never completed the non-offender treatment. Testimony from the caseworker, Ms. Schmidt[,] and Dr. Bliss, who has worked with the family throughout the life of the case, both believe Mother has not made much progress. They both believe that Mother knows what to say and when to say it, but she still has yet to learn how to interact with [Child] in an age[-]appropriate manner. Most importantly, is a continuous concern that Mother does not have the ability to keep [Child] safe and protected. Dr. Bliss testified that there was not a strong bond between Mother and [Child].[10] There was a level of comfort between [Child] and Mother. Nonetheless, [the] licensed psychologist recommended adoption by the Foster Parents. Mother's inability to empathize with her children continues to be a grave concern of CYF and this [c]ourt.

Orphans' Court Opinion, 12/7/20, at 12–13.

---

[10] Despite testifying that the bond between Mother and Child was weak, N.T., 9/4/20, at 104, Dr. Bliss testified, somewhat contradictorily, that termination of Mother's parental right would be traumatic for Child. *Id.* at 80–81. We observe, however, that severance of contact between a parent and child understandably could be "traumatic," but it does not necessarily equate to the existence of a strong parental bond. We discuss this further *infra*.

We discern no abuse of discretion; the court's conclusions are based on its credibility findings, and it weighed the evidence in favor of Dr. Bliss over that of Ms. Schmidt. **See Adoption of S.P.**, 47 A.3d at 826 ("[A]ppellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents.").

The record demonstrates that on the date of the subject proceeding, seven-year-old Child had been removed from Mother's care for three years, far in excess of the minimum twelve-month statutory requirement. 23 Pa.C.S. § 2511(a)(8). The conditions which led to Child's removal continued to exist because Mother made minimal progress developing her parenting skills and never successfully completed the prescribed non-offenders treatment. To the extent Mother's therapist and visitation coaches testified that in the past year, Mother progressed in her parenting skills and acknowledged Father's crimes against her older daughter, the record demonstrates that Mother's reunification with Child still was not imminent. Indeed, Mother's visitation remained supervised and coached, and it had not been increased during the life of the case. This Court has recognized that Section 2511(a)(8) implicitly recognizes that "a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for

permanence and stability to a parent's claims of progress and hope for the future." *In re I.J.*, 972 A.2d at 11.

With respect to the third element of Section 2511(a)(8), whether termination of parental rights would best serve the needs and welfare of the child, the orphans' court weighed the testimony of Dr. Bliss, a licensed psychologist, over that of Stephanie Davis, Child's therapist. The court stated that Ms. Davis "was not qualified as an expert and therefore her diagnosis of [Child] was not considered by the [c]ourt when making its determination to grant" the involuntary termination petition.[11] Orphans' Court Opinion, 12/7/20, at 11.

Dr. Bliss testified regarding her virtual observations of Child with Mother, as follows.

---

[11] Upon review, Ms. Davis did not testify regarding her diagnosis of Child. Mother's counsel introduced into evidence, and the court admitted, a letter from Ms. Davis dated August 31, 2020, wherein she listed the following goals for Child's treatment:

> Increased communication of needs and feelings through exposure to emotional vocabulary; Eliminate enuresis; Eliminate encopresis; Rule out medical causes of enuresis/encopresis with pediatrician; Reduced argumentative behaviors with caretakers through behavioral charting with rewards; Improved strategies for organization during the school year; Improved strategies for addressing high activity levels, inattention/poor concentration, and impulsivity, especially during school year.

Mother's Exhibit A-2. Dr. Bliss performed an individual psychological evaluation of Child and diagnosed her with unspecified elimination disorder related to her recent defecations. N.T., 9/4/20, at 77.

Q. [I]n your most recent July 2020 evaluation, can you tell us about your observations of the interaction between [Child] and [Mother]?

A.    Yes.  So [Child] didn't appear uncomfortable or distressed at all with [Mother].  She is clearly familiar with her, seemed comfortable enough; but she didn't seem very interested in [Mother's] presence either.  The entire interaction was them playing side by one side with each other.  Kind of . . . parallel play that you see with little kids together.

* * *

They were building Legos that [Mother] had brought for [Child].  There was nothing negative about their play, but there was nothing positive either.  They were just kind of sitting side-by-side building with each other, occasionally commenting on the building, but not really playing together at all or working on it together at all.

[Child] at the beginning indicate[d] she didn't remember me.  I did ask her since I had seen her before.  But again, it is virtual, it had been some time.  She did not remember me supposedly, but she was much more interested in me, making contact with me, sharing experiences with me, showing me the things that she built, rather than [Mother, who] was right there with her in the room.

And throughout the appointment [Mother's] affect, her emotional expression, it was very flat when responding to me in a direct way.  So she would say appropriate comments or talk to [Child] during the play, but in a very non-energetic, flat manner. [She] wasn't really giving [Child] a whole lot to work with.  She did set her parental boundaries with [Child,] and [Child] complied when she did.  But yet there were also times that [Mother] did not have an understanding of age-appropriate behaviors or held [Child to] higher standards.

[Mother] was overly critical [in an] incident like [Child] dropping a [L]ego on the floor.  Or she told [Child] to calm down when [Child] didn't appear hyper or upset or anything, something minor happened.  [Mother] was like okay, okay, calm down. . . . [Child] wasn't worked up in any way.  It seemed [Mother] had a hard

time reading [Child's] cues or knowing what is normal age-appropriate behavior.

N.T., 9/4/20, at 72–74. On cross-examination by Child's counsel, Dr. Bliss testified that the parental bond between Mother and Child "appears weak and of a neutral [e]ffect. As I mentioned, [Child] doesn't [appear] distressed by [Mother's] presence, but she's not really interested in her . . . presence. She's just kind of there and okay with that. . . . [Child] views her foster parents as her psychological parents, especially the foster mother." *Id.* at 104.

Dr. Bliss also testified regarding her virtual observations of Child with her foster parents, as follows.

So again, similarly, I was remote or virtual, but they were together obviously. And so in this interaction they were sitting at a table together playing with Play-Doh. So it is a similar type of activity as to what she was doing with [Mother], but very different types of interactions that you will see from [Child].

So [Child] appeared to enjoy the interactions a lot. She turned toward them and show them things when she built with Play-Doh. Chose to primarily interact with them. And once or twice she'd show me something, but even though now she is much more familiar and had seen me just a week prior, she was much more attuned to them and showing them things and talking to them. They were building things together with their Play-Doh, as well as separately. She called them mommy and daddy. She refers to [Mother] in the session as mommy [L.]. She was comfortable interrupting her foster parents. She felt that level of comfort with them. She answered [a] majority of the questions herself, describing what their life is like together and [her] description of it was age-appropriate as far as schedules, expectations, consequences, and everything.

*Id.* at 75. Finally, Dr. Bliss testified on direct examination that termination of Mother's parental rights still could have a negative effect on Child. *Id.* at 80–81.

Despite the record evidence that Child missed seeing Mother, the orphans' court concluded:

> [Child] remains with Foster Parents, and they have a positive parent-child relationship. [Child] follows Foster Mother's and Foster Father's directives. Foster Parents provide for [Child's] emotional, medical and educational needs. [Child] expressed that she wishes to remain with her [f]oster family.[12] CYF has clearly established that a healthy bond exists between Foster Parents and Child. [Child] looks to Foster Parents to fulfill her parental needs. Foster parents are able to provide [Child] with a stable home environment. A child's life does not remain in suspension while parents figure things out. [Child] has been in care for over three years; she has been in care almost[] as long as [she] lived with her parents. Every child deserves a stable and consistent home that will provide love, support, comfort[,] and ensure all of [her] needs are met. Mother has failed to [satisfy] the problem that brought [Child] into care. For that reason, this [c]ourt concludes that termination of parental rights serves the needs and welfare of Child.

Orphans' Court Opinion, 12/7/20, at 13.

Based on our careful review of the record evidence, we discern no abuse of discretion. *See Adoption of S.P.*, 47 A.3d at 826–827 (stating, "[E]ven

---

[12] At the conclusion of the testimonial evidence, Child's counsel, Attorney Ludin, declared on the record that Child "stated unequivocally to me that she wants to stay with her foster parents. . . . She said she loves her mommy and daddy. She obviously was referring to [her foster parents]." N.T., 9/4/20, at 236. However, he stated that Child also "wants to continue to visit with Mother and her sister. That was unequivocal as well." *Id.* Attorney Ludin recommended that Child remain with her foster parents. He stated, "She's happy there. She is stable there." *Id.*

where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment. . . .") (citation omitted). Therefore, we conclude that the record supports terminating Mother's parental rights under 23 Pa.C.S. § 2511(a)(8).

With respect to Section 2511(b), we are guided by the following legal principles:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. ***In re K.K.R.S.***, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. ***See In re T.D.***, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." ***In re Adoption of T.B.B.***, 835 A.2d 387, 397 (Pa. Super. 2003).

***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011).

In considering the affection a child may have for her natural parents, this Court has stated:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the

> children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

In addition, our Supreme Court has advised: "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that in weighing the bond considerations pursuant to 23 Pa.C.S. § 2511(b), "[C]ourts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Mindful of these legal principles, we have thoroughly reviewed the testimonial evidence and discern no abuse of discretion by the court. The court carefully weighed the evidence in light of Child's interests and concluded that terminating Mother's parental rights serves the developmental, physical, and emotional needs and welfare of Child pursuant to 23 Pa.C.S. § 2511(b). Accordingly, we affirm the order.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/26/2021